UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Sandra D. Rietmann,

      Plaintiff,

v.                                                                                                          Civil No. 07-4176 (JNE/SRN)
                                                                                                     ORDER

Jonathan W. Dudas, Director of the
United States Patent and Trademark Office,

      Defendant.

Andrew Spicer, Esq., Carlineo Markus LLP, and Anne Awsumb, Esq., and Dustin Bower, Esq., Purdue & Awsumb, P.A., appeared for Plaintiff Sandra D. Rietmann.

Thomas Stoll, Esq., United States Patent and Trademark Office, and David Fuller, Esq., Office of the United States Attorney for the District of Minnesota, appeared for Defendant Jonathan W. Dudas, Director of the United States Patent and Trademark Office.

      Sandra Rietmann brought this action under the Administrative Procedure Act (APA) to review the denial by Jonathan Dudas, Director of the United States Patent and Trademark Office (Director), of her petition to accept delayed payment of a maintenance fee. The case is before the Court on cross-motions for summary judgment. For the reasons set forth below, the Court grants the Director's motion, denies Rietmann's motion, and affirms the denial of Rietmann's petition to accept delayed payment of a maintenance fee.

                                                      **I.      BACKGROUND**

      United States Patent No. 5,819,049 ('049 Patent) issued to Rietmann on October 6, 1998. To maintain her patent, Rietmann had to pay maintenance fees at three points during the patent's life. *See* 35 U.S.C. § 41(b) (2000). The first was due three years and six months after the patent's issuance; the second seven years and six months after issuance; and the third eleven years and six months after issuance. *See id.* Rietmann did not pay the first maintenance fee by

1

the due date or the end of a six-month grace period. *See id.* The patent therefore expired at the grace period's end. *See id.*

In November 2006, more than four years after the '049 Patent's expiration and after the end of the grace period associated with the second maintenance fee, Rietmann filed a "Petition to Accept Unavoidably Delayed Payment of Maintenance Fee in an Expired Patent under 37 CFR 1.378(b)" (First Petition). *See* 35 U.S.C. § 41(c)(1) (authorizing the Director to accept late payment of a maintenance fee if the delay was unavoidable); 37 C.F.R. § 1.378(b) (2007). According to the First Petition, the attorney who prosecuted the '049 Patent, Ivar Kaardal, was negligent in representing Rietmann before the Patent and Trademark Office (PTO). Kaardal's alleged negligence included the failure to prevent the '049 Patent's expiration. Kaardal allegedly never explained maintenance fees to Rietmann, never reminded her about maintenance fees, and never told her that the '049 Patent had expired. In addition, Rietmann claimed that "[d]uring 2001-2002, [she] was completely overwhelmed by the combination of numerous medical, employment, home, personal, financial, and social situations that unquestionably affected [her] ability to function." Rietmann first learned of her patent's expiration in April 2006 from Technology, Patents & Licensing, Inc., which assisted Rietmann in compiling information to substantiate her claim of unavoidable delay. She also "executed a deal, such that, if the '049 Patent is revived, [she] will receive a significant, six-figure sum of money." Although aware in April 2006 that she had to pay the second maintenance fee by October 2006, she asserted that she filed the First Petition as soon as possible after learning of her patent's expiration. Thus, she submitted the first and second maintenance fees with the First Petition.

On February 15, 2007, the PTO dismissed the First Petition. The PTO concluded that neither Rietmann's lack of knowledge of the need to pay the first maintenance fee nor her

preoccupation with other matters that took precedence over paying the fee constituted unavoidable delay. The PTO also concluded that Rietmann had not demonstrated any agreement with Kaardal to track and pay the maintenance fee. Assuming that Kaardal's representation of Rietmann continued to when the first maintenance fee was due, the PTO stated that Rietmann would be bound by the actions or inactions of her chosen representative. With regard to Rietmann's allegations of health issues, the PTO acknowledged that physical or mental incapacitation can be a cause of delay. To be unavoidable delay, the incapacitation had to render Rietmann unable to conduct business with the PTO from her patent's expiration to the filing of the First Petition. The PTO concluded that the record revealed that Rietmann "was not disabled, throughout the period that the patent was expired, such that she could not have earlier paid the maintenance fee." The PTO also concluded that Rietmann had failed to substantiate her allegations of financial hardship. In summary, the PTO concluded that Rietmann had not exercised the standard of care observed by a reasonable person in the conduct of his or her most important business.

Rietmann responded by filing a Renewed Petition seeking reconsideration of the PTO's February 15 decision. She asserted that her delay in paying the maintenance fee was unavoidable due to her physical and mental incapacitation and her attorney's negligent, deceptive, and fraudulent representation. After receiving information about her attorney's disciplinary history before the PTO pursuant to a Freedom of Information Request, Rietmann supplemented her Renewed Petition.

On August 10, 2007, the PTO issued its decision on the Renewed Petition as supplemented. The PTO denied Rietmann's request to accept delayed payment of the maintenance fee. Briefly, the PTO reiterated that neither Rietmann's unawareness of the need to

3

pay the first maintenance fee nor her preoccupation with other matters that took precedence over paying the fee constituted unavoidable delay. The PTO again concluded that Rietmann had failed to demonstrate any agreement with Kaardal to monitor the maintenance fee. The PTO noted that Kaardal's exclusion from practice before the PTO in 2004 was irrelevant because the record indicated that Kaardal was not representing Rietmann when the first maintenance fee was due. The PTO also noted that neither Rietmann nor Kaardal had taken any steps to ensure payment of the first maintenance fee. The PTO rejected Rietmann's assertion that financial difficulties rendered the delay in payment unavoidable because the record revealed that she chose to use her income during the relevant time period for purposes other than the maintenance fee. As to her alleged incapacitation, the PTO stated that Rietmann had not shown that the incapacitation coincided with the entire period of delay. In summary, the PTO stated that "the showing of record is of a lack of diligence on the part of [Rietmann]."

Less than two months later, Rietmann brought this action. The parties now move for summary judgment. *See Smith v. Mossinghoff*, 671 F.2d 533, 537 (D.C. Cir. 1982).

## II. DISCUSSION

As noted above, notwithstanding a patent's expiration for failure to pay a maintenance fee, "[t]he Director may accept the payment of any maintenance fee required by subsection (b) of this section . . . at any time after the six-month grace period if the delay is shown to the satisfaction of the Director to have been unavoidable." 35 U.S.C. § 41(c)(1). A petition to accept an unavoidably delayed payment of a maintenance fee must include:

> A showing that the delay was unavoidable since reasonable care was taken to ensure that the maintenance fee would be paid timely and that the petition was filed promptly after the patentee was notified of, or otherwise became aware of, the expiration of the patent. The showing must enumerate the steps taken to ensure timely payment of the maintenance fee, the date and the manner in which

4

>patentee became aware of the expiration of the patent, and the steps taken to file the petition promptly.

37 C.F.R. § 1.378(b)(3); *see Ray v. Lehman*, 55 F.3d 606, 609 (Fed. Cir. 1995). "[I]n determining whether a delay in paying a maintenance fee was unavoidable, one looks to whether the party responsible for payment of the maintenance fee exercised the due care of a reasonably prudent person." *Ray*, 55 F.3d at 609; *see Burandt v. Dudas*, No. 2007-1504, 2008 WL 2344993, at *4 (Fed. Cir. June 10, 2008). In *Burandt*, the Federal Circuit set forth the applicable standard of review:

>We review a district court's grant of summary judgment de novo, reapplying the standard applicable at the district court. Because this case was brought under the APA, we apply the standard of review set forth in that statute. The APA provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Under an arbitrary and capricious standard, the scope of review is narrow and a court may not "substitute its judgment for that of the agency." A court reviewing the agency decision "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors."

*Burandt*, 2008 WL 2344993, at *3 (citations omitted).[1] Here, the parties dispute whether the Director abused his discretion in concluding that Rietmann had not established unavoidable delay based on either Kaardal's intentional deception and gross negligence or her incapacitation.

**A.      Kaardal**

Rietmann asserts that she established unavoidable delay because she reasonably relied on Kaardal to monitor maintenance fees and he intentionally deceived her or was grossly negligent.

---

[1] In her motion papers, Rietmann requested de novo review of the Director's decision. At the motion hearing, Rietmann acknowledged that the arbitrary and capricious standard governs. *See* 35 U.S.C. § 41(c)(1); *Burandt*, 2008 WL 2344993, at *4, 6 (stating that section 41(c)(1) "provides the Director with discretion to accept a late maintenance fee" and "disagree[ing] with . . . assertion that the district court erred by giving deferential review to the PTO's determination of unavoidable delay").

5

As noted above, the Director concluded that Rietmann had no agreement with Kaardal regarding maintenance fees and that Rietmann was bound by Kaardal's actions or inactions, assuming that his representation continued to the first maintenance fee's due date.

In a declaration submitted in support of her First Petition, Rietmann described the prosecution of the '049 Patent and Kaardal's role in it.  In January 1996, Rietmann disclosed her invention to Invention Submission Corporation (ISC) under an agreement of confidentiality.  A few months later, she received from ISC a Basic Information Package that included a Preliminary Patentability Search Report prepared by Kaardal.  Before receiving the package, Rietmann had not had any contact with Kaardal.  In July 1996, Rietmann entered into an agreement with Western Invention Submission Corporation (WISC), an affiliate of ISC, to submit her invention to industry.  She also entered into a Patent Services Addendum with WISC.  Pursuant to the addendum, WISC agreed to assist with the submission of a patent application and the response to the PTO's initial substantive communication.  WISC also agreed to pay for reasonable and expected legal fees.  In addition, WISC hired Kaardal on Rietmann's behalf to prepare, file, and prosecute a patent application.  Although she had contracted with WISC, Rietmann received most communications about her invention from ISC, even if they were from Kaardal.  Rietmann never understood the relationship between ISC, WISC, Kaardal, and a drafting company that prepared drawings for her application.  She never spoke to Kaardal regarding the preparation, filing, or prosecution of her application.

Rietmann's application was filed in February 1997, and she paid the filing fee.  She paid the issue fee in February 1998, and the '049 Patent issued in October 1998.  In the summer and fall of 1998, Rietmann called the PTO on multiple occasions regarding the issuance of her patent and a change of address.  During one of the calls in August 1998, she asked the PTO to mail the

original patent to her instead of ISC. She thought the PTO would send any correspondence related to the '049 Patent to her. The last communication she had from Kaardal was a letter in October 1998. In that letter, Kaardal forwarded the original patent and mentioned maintenance fee payments. The original patent also disclosed the requirement to pay maintenance fees.

After learning of her patent's expiration, Rietmann discovered that a maintenance fee reminder was sent to Kaardal in April 2002. Kaardal did not forward the reminder to her.

In support of her Renewed Petition, Rietmann submitted a supplemental declaration. In it, she asserts that she believed Kaardal would continue to represent her interests with respect to the '049 Patent after its issuance. In March 2004, Rietmann called a patent attorney and discussed whether to retain his services to research whether anyone was infringing on the '049 Patent. Ultimately, she decided not to retain the attorney.

The Court's review of the record reveals that the Director's decision was not arbitrary, capricious, or an abuse of discretion insofar as Rietmann attempted to show unavoidable delay based on Kaardal's alleged deception or negligence. Substantial evidence contradicts Rietmann's conclusory assertion in her supplemental declaration that Kaardal would continue to represent her with regard to the '049 Patent after its issuance. For example, she characterized the Patent Services Addendum, pursuant to which WISC agreed to pay legal fees and retained Kaardal, as relating to the preparation and filing of a patent application and the response to the PTO's initial substantive communication. In August 1998, she called the PTO to change her address and thought that the PTO would send all documents related to the '049 Patent to her instead of ISC. In March 2004, she called a patent attorney other than Kaardal about potential infringement on the '049 Patent. Substantial evidence supports the Director's conclusion that Rietmann failed to establish an agreement with Kaardal regarding maintenance fees. Even if

7

there were such an agreement, then Rietmann would be bound by Kaardal's acts or omissions. *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962); *Huston v. Ladner*, 973 F.2d 1564, 1567 (Fed. Cir. 1992). Moreover, Kaardal informed Rietmann of maintenance fees in October 1998, and there is no evidence that Rietmann made any subsequent inquiries of Kaardal or that Kaardal misrepresented the status of the '049 Patent to her.[2] *Cf. Burandt*, 2008 WL 2344993, at *5. Insofar as Rietmann attempted to demonstrate unavoidable delay based on Kaardal's alleged deception or negligence, the Court concludes that the Director's decision was not arbitrary, capricious, or an abuse of discretion.

**B.      Incapacitation**

Rietmann contends that she established unavoidable delay because she was incapacitated. She claims that she was incapacitated in 1998 when she received notice from Kaardal and the original patent about the requirement to pay maintenance fees such that the notice was "meaningless." She also asserts that she was incapacitated during the period to pay the first maintenance fee and that her incapacitation continued for several years after her patent's expiration.

In the declaration submitted in support of her First Petition, Rietmann stated that she had a history of medically diagnosed mental health issues, including depression and anxiety, and several other ailments. After describing the treatment that she obtained in the mid- and late-1990s, Rietmann stated that she felt by the end of 1998 "as if [her] life was coming apart, as [she] continued to experience symptoms of anxiety, chronic depression and fatigue." With

---

[2]     Rietmann relies heavily on *In re Lonardo*, 17 U.S.P.Q.2d 1455 (Comm'r Patents 1990). In *Huston*, the Federal Circuit stated that *Lonardo* is not binding. *Huston*, 973 F.2d at 1567. Moreover, *Lonardo* is distinguishable. In *Lonardo*, the petitioner diligently contacted his attorney regarding a patent application whose abandonment was knowingly concealed by the attorney.

8

regard to 2001-02, when she could have paid the first maintenance fee, Rietmann stated that she "was unable to realize that [she] had to pay a maintenance fee" due to chronic depression, anxiety, other medical conditions, and life events.  In March 2001, she was diagnosed with a breast abnormality and later submitted to a fine needle aspiration for cytology.  In May 2001, a destitute friend, in need of moral and financial support, moved in with Rietmann.  Rietmann provided for and supported her friend, who stayed with Rietmann until January 2002.  In June 2001, a biopsy of Rietmann's liver revealed the presence of fatty liver disease.  Later that year, Rietmann was diagnosed with a myomatous uterus.  In March 2002, she had surgery to remove several myomas from her uterus.  She recovered from the surgery for approximately two months and then returned to work.  In the spring of 2002, Rietmann felt overwhelmed by her medical conditions, job, social life, and emotional state.  She began therapy with Rebecca Stahle in June 2002.  The next month, Rietmann was injured in an automobile accident.  After her insurer declined to pay for medical care for her injuries, Rietmann hired an attorney and ultimately resolved the payment dispute in February 2005 after an arbitration hearing.  The dispute and medical care contributed to her stress and "shifted [her] focus."  Thus, Rietmann maintains that it was impossible for her to have timely paid the first maintenance fee.

Rietmann also submitted declarations from Charles Haislet, who performed the surgery in March 2002; Wendy Bongers, Rietmann's physician since March 2004; Rebecca Stahle, Rietmann's psychotherapist since June 2002; and Jonathan Mack, who performed a psychological evaluation on Rietmann in April 2007.  Haislet stated that the period leading up to the surgery, the surgery itself, and the recovery period "were likely traumatic periods" for Rietmann and that he "would expect that it took . . . Rietmann approximately six to eight weeks to recover from the surgery."  Bongers stated that Rietmann was initially prescribed medication

in September 1998 to help control Rietmann's depression and anxiety; that Rietmann experienced particularly high stress and anxiety in 2001 and 2002; that periods of anxiety or depression would typically impair Rietmann's ability to function normally on a daily basis; that Rietmann continues to take medication to help control her depression and anxiety; and that Bongers signed forms for Rietmann to take leave under the Family Medical Leave Act.  Stahle stated that she treated Rietmann on a weekly or twice monthly basis from June 2002 to 2006 and has since treated Rietmann once or twice per month; that Rietmann's "levels of stress/anxiety and depression have fluctuated several times over the course of her treatment"; and that Rietmann finds it difficult to cope with several concurrent activities and may become overwhelmed and unable to make decisions.  Mack reviewed medical and other records concerning Rietmann, conducted a four-hour clinical interview of her, and performed several psychological tests on her.  He opined that Rietmann had several psychological, psychiatric, and neuropsychological disorders since at least 1988.  The disorders included:  panic disorder with agoraphobia; post-traumatic stress disorder; dysthymic disorder; major depressive disorder; generalized anxiety disorder; learning disorder; pain disorder; and avoidant personality disorder with borderline and dependent features.  Mack opined that her disorders were "aggravated and inflamed during the 1997-98 and 2001-2005 time frames such that her Global Assessment of Functioning score at those times was in the Serious Symptoms range of 41 – 49."  A table attached to Mack's report describes a score from 41-50 as:  "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job)."  Mack also opined that Rietmann's "state of psychological overwhelm was such that she was too incapacitated by the . . . diagnostic conditions to be able to attend to her obligations to the U.S. Patent Office."

Notwithstanding Rietmann's assertion that she proved her incapacitation, there is substantial evidence in the record that indicates Rietmann was not incapacitated. As noted above, Rietmann claims that she was incapacitated in the fall of 1998 when she received notice from Kaardal and the original patent of the requirement to pay maintenance fees. However, in the declaration submitted in support of her First Petition, Rietmann stated that she called the PTO on multiple occasions in the summer and fall of 1998 regarding the '049 Patent's issuance. After the patent issued, Rietmann acknowledged that she tried to market or license the patent, a process she found "very frustrating and unfruitful." She felt that she was "always being forced into a deal that was not in [her] best interest."

Rietmann's employment history also undermines her claim of incapacitation before, during, and after the window to pay the first maintenance fee. From 2000 to at least 2005, Rietmann was employed by Target Corporation. On her federal tax returns from 2000 to 2005, she called herself a credit representative, a credit specialist, a fraud associate, and a credit fraud associate.

In May 2001, a few months before she could have paid the first maintenance fee, Rietmann admits that she took on the role of "provider" for a "destitute" friend in need of "moral and financial support." She continued in that role until January 2002, a few months after the window to pay the first maintenance fee had opened.

As noted above, in July 2002, during the window to pay the first maintenance fee, Rietmann was injured in an automobile accident. She disputed her insurer's refusal to pay for her medical care, hired an attorney, and ultimately resolved the dispute after arbitration in 2005. She admits that she "shifted her focus" during this dispute.

11

In the meantime, in March 2004, Rietmann contacted a patent attorney to discuss whether to retain his services to research potential infringement on the '049 Patent. Ultimately, she decided not to retain the attorney.

On her 2004 federal tax return, she took a capital loss. An attached schedule explained that Rietmann had stopped actively marketing her patent in 2004 and declared it "worthless." The capital loss carried over to her 2005 federal tax return, which was dated March 20, 2006, approximately one month before Technology, Patents & Licensing first contacted Rietmann.

Finally, a review of the medical reports as summarized in Mack's report undermines Rietmann's claim of unavoidable delay based on incapacitation. On August 15, 2002, Rietmann's "depression was noted to be improved." On February 13, 2003, Rietmann reported that she had done well on the medication for her depression, and her psychiatric screen was within normal limits. On May 14, 2003, Rietmann reported that she was very busy at work. On March 15, 2004, Rietmann denied suicidal ideation and problems with concentration, energy, and appetite. On June 21, 2004, Rietmann was stable and doing well. She again denied suicidal ideation and problems with concentration, energy, and appetite. On July 6, 2004, Rietmann's ears were examined, and she obtained a signature on a scuba clearance form in preparation for a scuba trip in September 2004. On November 14, 2005, an assessment of her mood and affect revealed no depression, anxiety, or agitation. She was still taking the medication to control her depression.

On this record, the Director's decision to deny Rietmann's petition was not arbitrary, capricious, or an abuse of discretion insofar as Rietmann attempted to show unavoidable delay based on incapacitation. Rietmann maintained employment from at least 2000 to 2005 at Target as a credit or fraud associate. During that time, she was able to support a destitute friend for

several months; attempt to market her invention; engage in a dispute with her insurer by hiring an attorney and pursuing arbitration; contact a patent attorney regarding infringement on the '049 Patent; declare the patent worthless and take a capital loss on her 2004 and 2005 federal tax returns; and plan a scuba trip. Without belittling the conditions Rietmann has experienced, the Court concludes that there is substantial evidence in the record that Rietmann could have inquired into the status of her patent in the years between its issuance and her discovery of its expiration. *See Burandt*, 2008 WL 2344993, at *6. Insofar as Rietmann attempted to demonstrate unavoidable delay based on incapacitation, the Director's denial of her petition was not arbitrary, capricious, or an abuse of discretion.

## III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Rietmann's motion for summary judgment [Docket Nos. 39, 43, 50] is DENIED.

2. The Director's motion for summary judgment [Docket No. 17] is GRANTED.

3. The Director's denial of Rietmann's petition to accept delayed payment of a maintenance fee is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 27, 2008

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge